IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2018

**CHARLES GLEN CONNOR v. STATE OF TENNESSEE[1]**

**Appeal from the Criminal Court for Davidson County**
**No. 2012-B-1666    Mark J. Fishburn, Judge**

_____

**No. M2017-01003-CCA-R3-PC**

_____

The Petitioner, Charles Glen Connor, appeals from the Davidson County Criminal Court's denial of post-conviction relief arguing (1) that "the State failed to provide and defense counsel failed to seek discoverable recorded interviews of witnesses in violation of <u>Brady v. Maryland</u>, [373 U.S. 83 (1963)]," and (2) that trial counsel "failed to keep [the Petitioner] informed of the evidence against him."[2] After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Nathan D. Cate, Madison, Tennessee, for the Petitioner, Charles Glen Connor.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn Funk, District Attorney General; and Vince Wyatt, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On February 6, 2012, the Petitioner was in his home with two other individuals, Fancy McCord and Kevin Lowe, smoking crack cocaine. At some point, Kevin Lowe attempted to take the Petitioner's television, and the Petitioner shot him in the leg. Upon hearing the shot, a neighbor called police. When the initial responding officers arrived,

_____

[1] The Petitioner's name is spelled in various ways throughout the record. For purposes of this appeal, we will spell it as indicated in the indictment.

[2] The Petitioner raised several other issues in his pro se and amended petitions for post-conviction relief. None of those issues are raised on appeal and are therefore waived.

the Petitioner threatened them with his gun. Nashville Metro Police Department's S.W.A.T. team was then called, and a two-hour stand-off ensued. When S.W.A.T. ultimately entered the Petitioner's home, the Petitioner fired additional shots in the direction of the officers. Based on these events, on June 15, 2012, the Petitioner was indicted for two counts of attempted first degree murder, three counts of aggravated assault, two counts of especially aggravated kidnapping, and employment of a firearm during the commission of a dangerous felony. On September 19, 2013, the Petitioner entered a guilty plea to two counts of attempted first degree murder of Officer John Hutcheson and Fancy McCord; three counts of aggravated assault of Kevin Lowe, Officer Michael Ryan, and Officer Steven Smith; and two counts of attempted aggravated kidnapping of Fancy McCord and Kevin Lowe, for which the Petitioner received an effective sentence of seventeen years' confinement, to be served at 30% release eligibility. The State provided the following factual basis in support of the Petitioner's plea:

> [O]n February 6th of 2012, Rodney Prewitt . . . called 9-1-1 and reported hearing an argument, about shots fired at his neighbor's house. Officers responded to the location and they also heard someone shouting inside. They knocked on the door and identified themselves, at which point the [Petitioner] refused to open the door. Forced entry was made and a female was observed lying on the floor. After Officer Ryan entered the apartment, he started moving within it, and he, as he entered the threshold, he observed the [Petitioner] . . . with a handgun pointed in his direction. [The Petitioner] threatened to shoot both officers if they entered the apartment and both Officer Ryan and Officer Smith quickly exited and called for S.W.A.T. [T]he S.W.A.T. team responded and officers set the perimeter around the building. At approximately 1:45, additional shots fired inside the apartment as S.W.A.T. made entry. Officer[] [Hutcheson] returned fire, and the [Petitioner] threw his gun to the floor.

> Kevin [Lowe] and Fancy O'Neal, aka Fancy McCord[3] were both located inside the [Petitioner's] apartment and both had gunshot wounds. Mr. [Lowe] had a gunshot wound to his leg and Ms. [McCord] had gunshots to her chest, [her] thigh and her lower leg. Both were transported to Vanderbilt Medical Center emergency room. Several crack pipes were also found in the apartment. [The Petitioner] was arrested at the time. The

---

[3] Throughout the record, Fancy McCord is referred to as Fancy O'Neal, Fancy McCord, and Fancy Luckey. We will refer to her as Fancy McCord.

victims stated that they were not free to leave during this assault and—aggravated assault and kidnapping.

The Petitioner did not file a direct appeal of his convictions or sentence. On September 23, 2014, the Petitioner filed a pro se petition for post-conviction relief arguing ineffective assistance of trial counsel. The pro se petition was forty-five pages in length and raised eighteen grounds for relief but did not specifically allege that the State withheld exculpatory evidence in violation of Brady. On November 19, 2014, the post-conviction court appointed counsel, and on January 13, 2016, a motion entitled "Request for production of Exculpatory information pursuant to Brady" was filed. The motion specifically requested the State to produce copies of the recorded statements of "Officers Haywood, Hutcheson, Ryan, Smith, Luckey, and Pruitt," which, according to the Petitioner, contradicted the statements in the officers' supplemental reports regarding "the number and time of shots fired to the position and placement of all individuals at all times." The motion further sought the recorded statements of Fancy McCord and Kevin Lowe, both of whom, according to the Petitioner, "acknowledged engaging in criminal activity and gave contradictory accounts of events[.]"

On July 21, 2016, an amended petition for post-conviction relief was filed, incorporating all previously raised grounds for relief. The amended petition specifically alleged that trial counsel "failed to uncover key discrepancies in the [S]tate's case which would have assisted the [Petitioner] in making an intelligent decision about trial strategy." It further referenced inconsistent statements by officers, varying accounts of shots fired, varied amounts of physical evidence related to shots fired, and alleged actions and statements of the Petitioner.

On October 19, 2016, the State responded to the Petitioner's amended petition. In its response, the State explicitly noted that the Petitioner had notified them of his intent to raise an unspecified Brady violation. Recognizing that the Petitioner had failed to specifically allege a Brady violation in either of his petitions, the State requested the post-conviction court to require him to do so with sufficient notice to the State prior to any hearing. The record does not show that the Petitioner amended his petition to include a Brady violation claim, following the State's response.

Evidentiary hearings were conducted by the post-conviction court in this case on January 17, 2017, and February 1, 2017. At the time he was appointed to represent the Petitioner, trial counsel had been a criminal defense attorney for approximately three or four years. He employed the services of a private investigator, a former veteran of the Metro Nashville Police Department, to assist him in the case. In an effort to provide the post-conviction court with context for the case, trial counsel relayed the circumstances leading up to the shooting as conveyed to him by the Petitioner. He said that the

- 3 -

Petitioner, Kevin Lowe, and Fancy McCord had been smoking "crack" at the Petitioner's home when Kevin Lowe threatened to take the Petitioner's television. In response, the Petitioner shot Kevin Lowe in the leg, and neighbors called the police. According to the Petitioner, when the first two officers responded, "one of them shot at [the Petitioner]," and the Petitioner "shut the door" because he believed they were going to kill him. A two-hour stand-off with the S.W.A.T. team ensued because the Petitioner did not want to come out until his parents arrived. Kevin Lowe and Fancy McCord remained in the house, and, at some point, the Petitioner shot Fancy McCord in the chest as she "lunged" at him. When the Petitioner shot Fancy McCord, the S.W.A.T. team breached the door, and additional shots were fired.

Trial counsel said that "timing" as it related to "logistics" of the direction of the bullets upon the officers' entry was important. The Petitioner initially told him that he did not have a "'direct recollection'" of the events, and this was a problem for trial counsel. However, prior to entry of the guilty plea, trial counsel had the logistics and ballistics reports from the crime scene technician. He was familiar with both reports and knew how the offense occurred. Based on the reports, trial counsel believed that there were "rounds fired towards the officer . . . and the timing [in] conjunction with it, otherwise [trial counsel] wouldn't have advised [the Petitioner] to take the plea." Asked if the Petitioner offered an explanation for why shots had been fired in the direction of the officers, trial counsel said, "[I]t was just one of those things that during the midst of the tussle [with Fancy McCord] that the gun went off the last two times, you know . . . however many rounds . . . [the Petitioner] just kept pulling the trigger until [it] wouldn't pull anymore. . . . [I]t was unintentional[.]"

Asked generally if "more peripheral evidence" of interviews from officers and victims would have been helpful in proposing a settlement offer to the State, counsel replied, "Of course." Counsel then agreed that he did not receive in discovery the recorded interviews of Rodney Pruitt, Michael Ryan, Detective Haywood, Steven Smith, Kevin Lowe, Officer Hutchison, and Fancy McCord. Trial counsel agreed it would have been significant if Kevin Lowe and Fancy McCord said Fancy McCord was shot as the officers entered the door, rather than before they entered. He reasoned the Petitioner could not have "equally shot" at the officer and Fancy McCord at the same time. Without delineating the relevant portion of the recordings, post-conviction counsel later admitted into evidence various DVD's containing the witness statements.

Trial counsel distinguished entry of a guilty plea and a jury trial and agreed that the above statements were customarily covered under the Jencks Act, which meant they were not required to be turned over to the defense until after the witnesses testified at trial. Trial counsel opined that the issue was whether he should have filed a Brady motion or moved for in-camera review of the statements. To the extent that post-

conviction counsel suggested that Fancy McCord was shot by Officer Hutchison, rather than the Petitioner, trial counsel explained that when a person kidnaps another and the victim is subsequently shot by the police during their rescue, the kidnapper remains responsible for the shooting.

Asked if the statements and recordings he did not receive could have assisted in his defense of first degree murder, trial counsel replied:

> Oh, I think so, and I think that's fair. And I never thought that [the Petitioner] wanted to kill that officer. I felt like he was a victim in this whole situation, but he was a victim of his own decisions as well as those around him, I mean, I felt, I still do, you know, I wanted . . . a better deal for him, I thought it was just a straightforward agg[ravated] assault, I thought the whole case was, . . . there were a lot of issues.

However, trial counsel later explained that his defense in this case was complicated because:

> [H]ow do we explain that the fact that once the police do show up there, these people are robbing you, why didn't you just open the door and let the police take the robbers away, you know, and that was a real problem, and it was because he was so high on crack, you know, he wasn't making sense. He thought that the first cops took a shot at him, and that, you know, initially I showed him those ballistics, and he was like, "See that's the hole in the wall where the police officer shot at me," you know, and that's why [he] shut the door and barricaded everything, but the ballistics didn't come back to show that that was from an officer's round. In fact, we never got any proof that those officers fired their guns at all, and so that kind of got forwarded more like, you know, he was in such a haze of what was happening . . . it was difficult.

He said the primary issue was the Petitioner's interaction with the S.W.A.T. team and the two officers who initially responded to the scene. Trial counsel was prepared to defend the charges concerning Kevin Lowe and Fancy McCord, and considered them "secondary" concerns. He theorized that Lowe and McCord were trying to rob the Petitioner of his television, and the Petitioner had a right to defend himself in his home; and that each witness had severe credibility issues.

Prior to entry of the guilty plea, trial counsel spoke with the Petitioner "around four or five times, maybe more" about the case. They discussed the theory of the case, possible defenses, and the Petitioner's sentencing range. Because the Petitioner was

bipolar and used "crack" during the offense, trial counsel "covered the intoxication realm ad nauseam," and had the Petitioner examined by a forensic psychologist to determine whether he had a viable intoxication defense. Trial counsel said there was no open file discovery in this case. He was provided with summaries of the officers' reports but not transcripts of them.

The Petitioner testified that he never received copies of recorded interviews from Officer Hutcheson, Kevin Lowe, Rodney Pruitt, or any of the officers involved in the offense. He also was not aware that Fancy McCord said in an audio interview that as police entered the apartment, the Petitioner shot her by accident. The Petitioner claimed that he was not made aware of any discovery in the case and never reviewed anything with trial counsel. Based on trial counsel's advice, the Petitioner believed that he would receive a life sentence or 30 years to be served at 100%, if he had gone to trial. However, had he known the information from the witness statements, he would have proceeded to trial because he did not believe he would have been convicted.

At the end of the January 17 hearing, the post-conviction court requested that Lieutenant Ragains, a crime scene investigator for the Metropolitan Nashville Police Department, be called to testify about the ballistics. At the February 1 hearing, Lieutenant Ragains testified that he helped to investigate and process the crime scene in question because it was an officer-involved shooting. He helped manage, process, and document all the evidence at the scene. His testimony was based on the crime scene photographs that were tracked in a PowerPoint presentation to the post-conviction court.

Lieutenant Ragains testified that there was no specific order when referring to each bullet and he did not know which order the bullets were fired. He said strike marks indicated a projectile had passed through the living room wall in the Petitioner's apartment, through the outside hallway, and into the neighbor's apartment across the hall. The projectile from the Petitioner's gun, the first shot that was analyzed, was found inside the wall of the neighbor's apartment.

The second bullet, from the Petitioner's gun, entered from the front of the television, and the projectile was found inside the television. The third and fourth shots, from the S.W.A.T. team, were in the back of the television had a trajectory from the door into the back of the television and went "through and through." The fifth shot skimmed the interior side of the front door and ricocheted off the door, hit the doorjamb, and key-holed into the drywall immediately beyond the doorframe. In his opinion, the front door was open or ajar when the projectile hit it, but he could not say to what degree. The projectile came from the Petitioner's gun.

- 6 -

The sixth projectile, from the Petitioner's gun, was recovered on the rug of the apartment and visible on the floor. Lieutenant Ragains said another projectile was found in the rug, which he believed was a fragment from a .223 standard issued gun to S.W.A.T. They also recovered other fragments and projectile pieces from a .223 at the scene in the doorway and hallway toward the end table. He believed this was indicative of officers firing a .223 from the doorway of the apartment. In total, there were four projectiles from the Petitioner's gun located from the scene and one projectile in Lowe's leg which would account for five total shots fired from the Petitioner's gun. Two rounds were located at the scene and fired from S.W.A.T.

On cross-examination, Lieutenant Ragains said the only bullet that could have been fired at a person standing in the open doorway was the one that struck the television. He said it was possible that the bullet that struck the television had traveled through a person before it hit the television. He also said the bullet that traveled through the wall to the neighbor's apartment could have passed through a person before entering the wall. He said it is possible to tell whether a projectile traveled through a person because you can pick up biological matter from it, but he said he could not say he or anyone else looked at the projectiles for biological material.

After the hearings concluded, the post-conviction court took the case under advisement and subsequently issued an extensive order denying the Petitioner relief. It is from this order that the Petitioner now appeals.

**ANALYSIS**

In his brief to this court, the Petitioner claims that "the State failed to provide and trial counsel failed to seek recorded witness interviews in violation of <u>Brady v. Maryland</u>, [373 U.S. 83 (1963)]." We dispense with this claim in short order because, as repeatedly noted by the State, it was not specifically included in any of the Petitioner's petitions for post-conviction relief as required by Tennessee Code Annotated section 40-30-110(c) (noting that "[p]roof upon the petitioner's claim or claims for relief shall be limited to evidence of the allegations of fact in the petition") and Tennessee Code Annotated section 40-30-104(d) ("The petitioner shall include all claims known to the petitioner for granting post-conviction relief and shall verify under oath that all such claims are included."). It is not clear to us why post-conviction counsel handled this issue in this fashion. He apparently put the State on notice of his intent to argue a violation of <u>Brady</u>, and received various materials from the State in response. The State appropriately objected because this issue had not been raised in the petition for post-conviction relief, and further demanded notice of the explicit grounds for the alleged <u>Brady</u> violation before the hearing. Despite the State's request, the record does not contain an amendment to the petition on this ground. Even more puzzling, it appears that post-conviction counsel fully

explored the Brady allegation at the hearing. So much so that at the close of trial counsel's direct testimony, the prosecutor asked, "Can I take at this point that we've waived any type of ineffective assistance of counsel argument, is that what we've done or solely based on Brady issue?" Based on post-conviction counsel's repeated allusions to Brady throughout the hearing, the post-conviction court specifically found that "no Brady material had been produced" at the hearing. In determining whether the Petitioner received ineffective assistance of counsel based on trial counsel's failure to properly investigate his case and fully advise him of the facts, the post-conviction court was compelled to note, "This court has reviewed all the 'missing' witness interviews, both written and recorded, and despite post-conviction counsel's characterization of the missing witness interviews, there is nothing in them that would exculpate Petitioner of any of the charges in the indictment." Finally, even if this court could overcome the procedural obstacles attendant to this issue, the Petitioner fails to specifically point out in this appeal how the recordings of the witness statements were exculpatory. Accordingly, because the Petitioner failed to include this issue in his pro se or amended petition for post-conviction relief, it is waived.

Next, the Petitioner argues three separate grounds in support of his claim that he received ineffective assistance of counsel in entering his guilty plea: (1) that trial counsel failed to keep him informed of the evidence against him; (2) that trial counsel did not possess all the necessary information to properly inform him; and (3) that trial counsel did not thoroughly review the discovery with him. The State argues, and we agree, that the post-conviction court properly denied relief on this issue. In reaching our conclusion, we are guided by the following well-established law pertaining to post-conviction relief. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (citations and internal quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562

(Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Felts, 354 S.W.3d at 276 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim" and "a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697). This court reviews a claim of ineffective assistance of counsel, which is a mixed question of law and fact, under a de novo standard with no presumption of correctness. Smith v. State, 357 S.W.3d 322, 336 (Tenn. 2011).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence establishes that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). When ineffective assistance of counsel is alleged in the context of a guilty plea, the prejudice analysis

> focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Grindstaff, 297 S.W.3d at 216-17. Finally, as relevant to the issues herein, the Tennessee Supreme Court has held that "[f]ailure to conduct a reasonable investigation constitutes deficient performance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999).

> Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. The Supreme Court has noted that the adversary system requires that "all available defenses are raised" so that the government is put to its proof. . . . And, of course, the duty to investigate also requires adequate legal research.

Baxter, 523 S.W.2d at 932-33 (quoting United States v. DeCoster, 487 F.2d 1197, 1203-04 (D.C. Cir. 1973)). In any ineffective assistance of counsel case, however, "a particular

decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Burns, 6 S.W.3d at 462 (quoting Strickland, 466 U.S. at 691).

In denying relief on this issue, the post-conviction court's order provided, in pertinent part, as follows:

> In this case, Petitioner's trial counsel testified that he discussed the case with Petitioner. He went over the discovery he had at the time, possible trial strategies, the strengths and weaknesses of the State's case, and the possible sentencing ranges for the charged offences. Further, trial counsel had Petitioner evaluated by a psychologist to negate the required mental state due to possible mental health or intoxication defenses, and trial counsel engaged the services of a private investigator to interview witnesses in this case. It appears from this testimony as well as the record in this case, that trial counsel was not deficient in his representation or his advice to Petitioner.

> Petitioner asserts that trial counsel did not have all the evidence in this case at the time of his plea, and that the failure to have all of this information rendered counsel's advice inadequate. However, it should be noted that this plea was entered into approximately four months before the trial date and that discovery is an ongoing process. This court has reviewed all the "missing" witness interviews, both written and recorded, and despite post-conviction counsel's characterization of the missing witness interviews, there is nothing in them that would exculpate Petitioner of any of the charges in the indictment. (internal footnote omitted). It appears that at the time of the plea, trial counsel had all of the discovery that was required by Tenn. R. Crim. Pro., Rule 16.

> The crux of Petitioner's complaint appears to be the length of his agreed sentence. He does not challenge the conviction itself, and he does not assert that he would have chosen to go to trial if all the "facts" he now asserts had been known to him at the time of the plea. Petitioner's original petition consists mainly of unsupported assertions as to the "weakness" of the State's case and conclusory statements as to the unreliability of the statements of the witness in this case as seen in *hindsight*. (emphasis in original).

Upon our review, the record does not preponderate against the determination of the post-conviction court. The record shows that trial counsel had an exceptional grasp of the

facts and circumstances of the case. He had been provided with discovery that complied with Rule 16 of the Rules of Criminal Procedure, and counsel reviewed it with the Petitioner prior to entry of his guilty plea. Trial counsel appropriately analyzed the credibility issues inherent in the testimony of Kevin Lowe and Fancy McCord. He narrowed his focus to the Petitioner's interaction with the S.W.A.T. team, which required him to review the ballistics and logistics reports. Trial counsel also engaged the services of a private investigator, a veteran of the Nashville Metro Police Department, and had the Petitioner evaluated by a psychologist to determine his competency at the time of the offense. He fully explored the potential defenses to or "weaknesses" in the State's case, and his investigation prior to entry of the guilty plea was reasonable. The record shows that the Petitioner was sufficiently advised of this during the Rule 11 guilty plea colloquy. In our view, the Petitioner essentially argues that trial counsel should have used the inconsistencies in the witness statements to obtain a more favorable settlement offer from the State. As noted by the post-conviction court, this does not amount to an attack on the effectiveness of counsel or the validity of his guilty plea, but rather, the Petitioner's overall dissatisfaction with the length of his sentence. Moreover, the record shows that trial counsel engaged in extensive negotiations with the State. He said it took "a lot" for them to reduce the case, and they required the Petitioner to plead "across the board."

Based on the record, the Petitioner has failed to establish by clear and convincing evidence that counsel was ineffective. Accordingly, the Petitioner has failed to demonstrate that his convictions are void or voidable because of an abridgment of his constitutional rights, and he is not entitled to relief.

## CONCLUSION

Based upon the foregoing reasoning and analysis, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE